The State v. Marler.

THE STATE v. MARLER.

1. A witness for the State was asked by the prisoner's counsel, whether he had not made certain statements to two persons, who were named, or any other person, which he denied. The two persons thus named were examined, and testified that he had made the statement imputed, when another being called, and the same question propounded to him, on motion of the solicitor he was not permitted to testify. The prisoner's counsel then proposed to call back the State's witness, and ask him whether he had not held the conversation imputed to him, with the last witness, which the Court refused. Held—that the Court ruled correctly, in refusing to permit the witness to testify; and that not permitting the State's witness to be called back, was a matter of discretion, and not revisable in this Court.

2. Where insanity is set up as a defence for the commission of crime, it should be established to the satisfaction of the jury, by strong, clear, and convincing proof. But if the jury entertain a reasonable doubt of the sanity of the prisoner, he should be acquitted.

Error to the Circuit Court of Montgomery.

THE defendant was indicted, tried and found guilty of murder, at the last term of Montgomery Circuit Court. The pre-

siding judge reserved certain questions for the opinion of this Court, as novel and difficult, on the following state of facts :

One of the witnesses for the State testified that, at the time the defendant gave the mortal wound, the deceased had not a gun. He was then asked by the counsel for the defendant, if he, the witness, had not, a short time after the killing took place, stated to one John Kelly, that deceased had a gun cocked and presented at the defendant, at the time he received the mortal wound, to which he answered in the negative. He was then asked, if he had not stated the same to one A. Sample, or to any other person, to which he also answered in the negative. The counsel for the defendant, after the evidence on the part of the State was closed, and after the introduction of Kelly and Sample, who both proved that the witness had the conversation with them which he denied, introduced one Armstrong, and offered to prove by him that the witness above referred to, a short time after the killing occurred, stated to him, that at the time the deceased received the mortal wound, deceased had a gun cocked and pointed, within a foot of the defendant's heart; which evidence was objected to by the State, and the objection sustained. The counsel for the defendant then moved to call back the witness first above referred to, and ask him if he had not, at the time stated, had with the witness Armstrong, the conversation they expected to prove by him ; but the Court refused to permit the witness to be called back to ask him that question, but the Court reserved the points arising on the refusal to permit Armstrong to testify, and the first witness to be called back, as novel and difficult.

Evidence was introduced by the defendant, tending to show, that, at the time of the commission of the act, he was laboring under derangement of mind. Evidence was also offered, tending to prove, that a certain negro woman had been in the possession of the defendant for eight or ten years, and was, at the time the killing took place, in the possession of the deceased—that the defendant went to the house of the deceased, and ordered said negro home, that she refused to go—and evidence was also offered, tending to show, that deceased called for his gun, and had it cocked and presented at defendant, at the time the mortal stroke was given. The counsel for defendant mov-

ed the Court to charge, that if the jury entertained any reasonable doubt as to the sanity of the defendant, at the time of the commission of the offence, in that case, they should acquit him; which charge the Court refused, and upon this point charged the jury, that if the facts, necessary to constitute the crime of murder, had been established by the proof, that it devolved upon the prisoner to prove his insanity at the time of the commission of the act; and that, if the jury from the evidence, entertained a reasonable doubt of the prisoner's insanity at the time of the commission of the act, and believed, also, that it would be murder in him, it would be their duty to find him guilty of murder.

Among other charges given to the jury, the Court stated to them, that if they should believe the defendant went to the house of the deceased, without legal authority to take possession of the negro woman, while in peaceable possession of the deceased, under color of right, it was an unlawful act, which the deceased would be authorized to prevent by the application of force, necessary for that object; and if nothing short of slaying his adversary could prevent the designs of the prisoner, the deceased in protecting his possession might do so, while the defendant himself, should he have killed the deceased under the circumstances, as stated, in the forcible attempt to take the negro from the possession of the deceased, would be guilty of murder.

The several points of law arising out of the charges so given, are referred, by the presiding judge, to this Court, for revision, as novel and difficult.

GOLDTHWAITE, for the prisoner, insisted that, as the foundation was laid for contradicting the principal witness, by asking him, on his cross-examination, if he had not had the conversation with Kelly and Sample, which was imputed, and as those persons, on being called, contradicted his statement, it was a question of veracity between the witnesses of the State, and those of the prisoner; and that the prisoner had a right to call others, to whom the State's witness had told the same thing, for the purpose of corroborating his own witness. If that view is not correct, he then maintained, that the Court should have

permitted the prisoner to call back the State's witness, and lay the ground for the examination, by asking him the particular question. He referred to Starkie on Evidence.

The charge of the Court on the defence of insanity, he contended, was the very reverse of the law—that the defence of insanity was not different from any other defence set up in excuse of crime; and if the jury were satisfied beyond a reasonable doubt, that the prisoner was insane at the time of the commission of the act, they must acquit.

The ATTORNEY GENERAL, contra, cited 22 Com. Law Rep. 360. The Queen's case, 1 Russell on Crimes, 11. Roscoe on Criminal Evidence, 780.

ORMOND, J.—Questions arising on the law of evidence, from the universality of their application, are always questions of great interest. The rule to be expounded in this case, has a double object—it is not only adopted as a means of arriving at truth, but is also designed for the protection of witnesses. The credit of any witness might be destroyed, if it were permitted, after his examination, to call other persons to contradict his testimony in Court, by proving that he had made different statements to them, without first enquiring of him whether he had made such statements to them, as he might thereby recollect the circumstances attending the supposed conversation, if real, and perhaps be able to explain it.

In this case, the ground was laid on the cross-examination of one of the State's witnesses, by asking him, if he had not made different statements to two persons, who were named, or to any other person. The two persons to whom his attention had been directed, were examined, and contradicted him. The prisoner's counsel then proposed to call another, to prove that the witness had the same conversation with him. The counsel for the prisoner now insists, that he should have been received, on the ground that it was a question of veracity between the State's witness, and those who contradicted him, and that they had a right to support their witnesses. We do not consider that the reasons assigned, furnish any cause for departing from the rule above laid down. Until the witness for the State had been enquired of as to the last witness offered, it

cannot be known that he would have denied having had the conversation with him he is prepared to testify to; he might admit and explain it, so as to make it harmonize with his testimony. As to fortifying their witnesses, who had contradicted the witness for the State, it is obvious that, by the contradiction which their testimony afforded, the object had already been accomplished. Whether it might not have been proper to admit such testimony, if the credit of the prisoner's witness had been assailed by proof, it is not necessary now to determine. As to the refusal of the Court to permit the witness for the State to be called back, for the purpose of laying the ground for the examination of Armstrong, we think it purely a matter of discretion, which cannot be reviewed in this Court. It might operate most mischievously, to permit the credit of witnesses to be thus impeached, after they had left the stand, and their evidence fully known; and of this, no one can judge so well as the Court, in whose view the whole transaction passes.

The remaining question is one of much greater magnitude, and of some difficulty.

In civil cases, where there is conflicting testimony as to the existence of any fact necessary to be established by either party, the jury are under the necessity of weighing the evidence, and of deciding in favor of that party, on whose side the evidence predominates. But in criminal cases, the humanity of our law requires, that the guilt of the accused should be fully proved. It is not sufficient that the weight of evidence points to his guilt. The jury must be satisfied beyond a reasonable doubt of his guilt, or he must be acquitted. It is not meant here, that the evidence on which to found a verdict in a criminal case, should be so conclusive as to exclude the presumption, that notwithstanding the evidence, the accused might be innocent, but only that it should be of a character to raise that high degree of probability, on which all human action depends.

In what respect then does the question of *insanity*, when set up as an excuse for an act which would otherwise be a crime, differ from any other fact, which a jury may be called on to decide in a criminal case. As insanity excuses the commission of crime, on the ground that the actor is not an accountable being, it is obvious that society has a deep interest in

providing the means of preventing its being assumed as a co-ver for the commission of crime, and as this is more easily simulated, and depends more on the volition of the actor himself, than any other defence, which would excuse the commission of an act otherwise criminal, the interest of the public demands, that it should be established by more conclusive proof. Thus, in Arnold's case, who was indicted for shooting at Lord Onslow, and who set up the plea of insanity, Tracy, Justice, observed, that the defence of insanity, must be clearly made out; that it is not every idle and frantic humor of a man, or something unaccountable in his actions, which will show him to be such a madman, as to exempt him from punishment; but that where a man is totally deprived of his understanding and memory, and does not know what he is doing, any more than an infant, a brute, or a wild beast, he will be properly exempted from punishment. In Billingham's case, who was indicted for the murder of Mr. Percival, Mansfield, C. J., in reference to the plea of insanity, relied on for the prisoner, said, " that in order to support such a defence, it ought to be proved by the most distinct and unquestionable evidence, that the prisoner was incapable of judging between right and wrong ; that in fact, it must be proved beyond all doubt, that at the time he committed the act, he did not consider that murder was a crime against the laws of God and nature, and that there was no other proof of insanity, which would excuse murder or any other crime."

These opinions, which are undoubted law, show the stringent nature of the evidence, by which insanity must be proved to be an excuse for crime ; but we do not understand that even this defence, must be established by evidence so conclusive in its nature, as to exclude every other hypothesis. This would be requiring something akin to mathematical proof, of which the subject is clearly not susceptible; but that the jury must be fully satisfied, that the defence is made out, beyond the reasonable doubt of a well ordered mind.

To test the case at bar by these principles—the Court was moved to charge the jury " that if they entertained any reasonable doubt, as to the sanity of the prisoner, they must acquit him," which charge the Court refused. Upon the princi-

ples here laid down, it was error to refuse this charge. If the prisoner was insane, he was not an accountable being; and can the public justice of the country repose with safety upon a verdict found by a jury, every member of which may have entertained a *reasonable doubt* of its propriety. It would have been highly proper, that the Court, when called on thus to charge, should have explained to the jury, that this defence required to be made out by strong, clear, and convincing proof, and guided by these considerations, if they still entertain a reasonable doubt of the sanity of the prisoner, it was their duty to acquit.

The charge which was given by the Court, does not appear to be objectionable; but as it is probable the jury were misled by the refusal to give the charge asked for, the judgment must be reversed, the cause remanded, and the prisoner directed to remain in custody, to await a trial *de novo;* unless, in the *interim,* he shall be discharged by due course of law.

COLLIER, C. J.—I concur in the reversal of the judgment of the Circuit Court, but as I do not entirely assent to the opinion of my brother Ormond, I deem it proper, briefly to declare my views upon the only point of difference between us.

The charge, as prayed in regard to the prisoner's insanity, should in my judgment have been refused. It supposed, that the jury would be bound to acquit, if they entertained a reasonable doubt as to the prisoner's sanity. The law requires insanity, when alleged as an excuse for the commission of an offence, to be made out by proof, as full and satisfactory, as is required to establish the existence of any other fact. A reasonable doubt, whether the accused was sane, would not authorize his acquittal—there must be a preponderance of proof to shew insanity to warrant a verdict of not guilty for that cause.

But in my apprehension, the error consists in the charge given to the jury. They are informed, that if they entertain a reasonable doubt as to the prisoner's insanity, it would be their duty to regard him as sane, and if the facts established a' case of murder, they should find him guilty. Now it was entirely possible for the jury to have entertained a reasonable doubt

of his insanity, although the weight of evidence was so strong, as to have lead their minds to the conclusion, that such was the prisoner's condition. This charge then must have induced the jury to believe, that the proof of insanity, should have been conclusive and irresistible. In this point of view, they may have been mislead, or have required proof too stringent. Hence I am in favor of reversing the judgment.